THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
THOMAS CVETICH *et al.*, Defendants-Appellants.

Second District   No. 77-371

Opinion filed July 3, 1979.

George Pease, Public Defender, of Waukegan (Mary Robinson and Alan
Goldberg, both of State Appellate Defender's Office, of counsel), for appellants.

Dennis Ryan, State's Attorney, of Waukegan (Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE LINDBERG delivered the opinion of the court:

Defendants Hewitt and Cvetich were charged with burglary (Ill. Rev. Stat. 1975, ch. 38, par. 19—1) and arson (Ill. Rev. Stat. 1975, ch. 38, par. 20—1). The cases against the two defendants were severed. After a jury trial, Cvetich was found guilty of both crimes and sentenced to two to eight years in the penitentiary. Hewitt, who was also tried before a jury, was found guilty of burglary but not guilty of arson. He was given a sentence of from five to 15 years. Both defendants have appealed and their cases have been consolidated on appeal.

The evidence presented at both trials was substantially similar. On October 24, 1976, at 4:30 a.m. a fire and theft occurred at the law offices of Rosing & Carlson, Ltd., in Waukegan. The building and furnishings were almost completely destroyed. Early that morning, Officer Kramer of the Waukegan Police Department was sent to an intersection near the fire to direct and reroute traffic. Finding no traffic problem, the officer proceeded to the Universal Restaurant. Kramer inquired of the owner if anyone had recently entered the restaurant. The owner pointed out two men. Kramer asked these two men for identification and they identified themselves as Cvetich and Hewitt.

Later on the 24th of October, Cvetich was picked up for questioning. He was found to be in the possession of a letter opener and umbrella which Mr. Rosing identified as being in his office prior to the fire. Cvetich gave the police a statement concerning his involvement and knowledge of the fire and the burglary. As a result of this questioning, the police recovered additional items belonging to the law firm.

Captain Jack Stewart, head of the Waukegan Fire Protection Bureau, examined the premises after the fire was extinguished. He testified that there were four to six different points of origin for the fire and that in his opinion the fire was a result of arson.

At the Cvetich trial, defense counsel objected to the judge's instructing the jury on the accountability (Illinois Pattern Instructions, Criminal, No. 5.03 (1968)). The defendant asserted that the evidence showed that Hewitt alone was responsible for the fire. During the course of its deliberations, the jury requested that they be given a dictionary so that they could define the word "abet." After consulting with counsel for both sides, the judge refused the request for a dictionary.

During his trial, defendant Hewitt attempted to call his former co-defendant Cvetich as a witness. The trial court first had Cvetich questioned in chambers. When Cvetich indicated he would exercise his

fifth amendment privilege, the judge did not allow Cvetich to be questioned in front of the jury.

Prior to trial, defendant Hewitt had moved to suppress certain statements he made to the police. There was conflicting testimony at the suppression hearing concerning Hewitt's arrest and subsequent interrogation. Waukegan police officers Kitchen and Repp testified that at 8 p.m. on October 24, 1976, they arrived at the home of the defendant's mother to serve an arrest warrant on the defendant. Hewitt answered the door and was given a copy of the warrant. The officers further testified that the defendant appeared normal to them. The defendant's mother informed the officers that Hewitt was a diabetic and would be in need of insulin in the morning. She was told to bring the insulin to the police station in the morning.

After transporting the defendant to the police station, the officers immediately began an interrogation. The defendant signed a waiver of rights form and then gave the officers a lengthy statement concerning his involvement in the burglary and fire. The statement was completed at approximately 10 p.m. Officer Repp testified that he then asked the defendant how he felt and Hewitt told him that his diabetes was acting up. The defendant was then transported to the hospital. After the defendant was taken to the hospital, Officer Repp typed up Hewitt's statement. The typed statement was signed by Hewitt the next day in the hospital in the presence of two other Waukegan police officers.

Hewitt testified that he arrived at his mother's home at approximately 9 a.m. on the morning of the 24th. He was sick because his diabetes was acting up and he went to sleep immediately. He awoke at approximately 1 p.m. and took his insulin. Hewitt further stated that at 4 p.m. he had symptoms of gagging, thirst, nausea, and dizziness. His mother also testified that the defendant looked very sick at that time and had been vomiting. Hewitt claimed that he still felt dizzy, weak, and light-headed when the officers arrived that evening. He and his mother informed the officers that he needed medical attention and the officers promised to get him that attention once he was booked. Hewitt stated that once questioning began he felt that he had to make a statement or he would not be taken to the hospital.

On arrival at the hospital, the defendant was taken to the emergency room and examined by Dr. Anil Gard. Tests revealed that Hewitt's blood sugar level was 355 milligrams per hundred milliliters of blood (normal is 80 to 120 milligrams per hundred milliliters) and that acetones were present in his urine. Dr. Gard testified that if this condition was left untreated, it could result in a coma or even be fatal. The defendant was admitted to the hospital, given insulin and fluids, and released at 9:15 a.m. on October 26, 1976.

On appeal defendant Cvetich contends that the arson charge against him was not proven beyond a reasonable doubt. Hewitt alleges that his statement to the police was involuntary and that the trial court erred when it prohibited Hewitt from calling co-defendant Cvetich to testify.

Defendant Cvetich does not contest his conviction for burglary, but asserts that his guilt for arson was not proved beyond a reasonable doubt. Cvetich is correct in his contention that mere presence or negative acquiescence at the scene of a crime cannot be the sole basis for criminal liability. (*People v. Shields* (1955), 6 Ill. 2d 200, 127 N.E.2d 440.) However, unlike the cases cited by the defendant, the facts of the present case show that Cvetich was not merely present at the scene of the crime. Cvetich concedes he was guilty of the burglary that led to the arson. The evidence clearly shows a common decision by Cvetich and Hewitt to commit the burglary.

■■ It is well settled that legal accountability under the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c)) extends to any act committed by an accomplice in furtherance of a common design. (*People v. Chavis* (1967), 79 Ill. App. 2d 10, 223 N.E.2d 196, *People v. Nowak* (1970), 45 Ill. 2d 158, 258 N.E.2d 313, *People v. Gregory* (1976), 43 Ill. App. 3d 1052, 357 N.E.2d 1251.) Thus Cvetich is legally accountable for arson even if, as he contends, the fire was started by Hewitt with no direct encouragement from Cvetich. The jury was properly instructed as to accountability and there is no reason to believe that they applied an incorrect definition of the term "abet."

● 2, 3 Defendant Hewitt's major contention is that his statement to police was involuntary and thus improperly admitted. The major basis of this contention is that immediately after his interrogation the defendant was taken to the hospital where his diabetes was found to be seriously out of control. However, voluntariness is not to be determined from a single factor, but from a consideration of all circumstances involved. (*People v. Pote* (1972), 5 Ill. App. 3d 856, 284 N.E.2d 366.) As the court in *Pote* observed in a case such as this:

> "A written statement signed by defendant is not involuntary when the answers to the questions are intelligent, direct, and positive, and there is no indication that defendant was distracted by pain or that his mind was diverted from the statement he was giving. (*People v. Davis*, 412 Ill. 391, 399, 107 N.E.2d 607.)" (5 Ill. App. 3d 856, 859.)

The defendant testified that he felt weak, tired, and sick during interrogation. However the officers who questioned the defendant testified that the defendant was acting normally when he waived his rights and made his statement and did not complain of any illness until after the interrogation was completed. The trial court credited the officer's

testimony over that of the defendant and this determination is not against the manifest weight of the evidence. This is especially so in light of the treating physician's testimony that the defendant was able to rationally communicate with him upon arrival at the hospital.

The defendant cites the case of *People v. Koesterer* (1976), 44 Ill. App. 3d 468, 358 N.E.2d 295, for the proposition that while a police officer might find a defendant to be rational and coherent, a physician might be able to correctly determine otherwise. *Koesterer* is clearly distinguishable as there the defendant was found to have taken massive doses of a drug that would cause a person to hallucinate and be somewhat irrational. Here there was no evidence that a diabetic condition would be accompanied by these types of symptoms.

While not argued by the parties, it is apparent from the record that the statement in question was not signed by the defendant until the day *after* the interrogation. Officer Repp typed up the statement from his handwritten notes, and this typed statement was later signed by Hewitt on October 25, 1976, in the presence of two other police officers. We find that this subsequent affirmation of the statement after medical treatment was well under way negates any inference that the defendant felt he was forced to make a statement in order to receive medical attention.

■■ Hewitt further contends that it was error for the trial court to prohibit his calling of co-defendant Cvetich to testify for the defense. While it is true that in general a defendant has the right to call any witness he desires, this right does not extend to a situation where a witness has indicated he will invoke his privilege against self-incrimination. (*People v. Myers* (1966), 35 Ill. 2d 311, 220 N.E.2d 297.) The defendant attempts to distinguish *Myers* on the basis that the witness there had previously exercised her privilege, while in the present case the privilege was not exercised until the examination in chambers. This argument is not persuasive as it is clear that it is the fact that the privilege will be exercised, and not how this fact is made known to the court, that is controlling. See *People v. Cole* (1977), 50 Ill. App. 3d 133, 365 N.E.2d 133.

The court below correctly called co-defendant Cvetich out of the presence of the jury to determine if he was going to exercise his privilege against self-incrimination. Once it was established that Cvetich would exercise his privilege, there was no useful purpose of forcing him to exercise this privilege in front of the jury. If, as in *Cole*, the defendant was concerned that the jury would make an unfavorable inference from a failure to call a co-defendant, any such unfavorable inference was overcome by the court's explanation to the jury that "on the advice of counsel Mr. Cvetich had decided that he does not wish to testify under the Fifth Amendment."

We hold that the arson charge against defendant Cvetich was proved

beyond a reasonable doubt. We further hold that Hewitt's statement to police was voluntary and that the trial court properly prohibited co-defendant Cvetich from testifying at the Hewitt trial. Therefore we affirm both judgments of the Circuit Court of Lake County.

Affirmed.

SEIDENFELD and RECHENMACHER, JJ., concur.